(Slip Opinion)                 Cite as: 595 U. S. ____ (2022)                 1

Per Curiam

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 21A240 and 21A241

————

## JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

21A240                              *v.*

### MISSOURI, ET AL.

## XAVIER BECERRA, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL., APPLICANTS

21A241                              *v.*

### LOUISIANA, ET AL.

ON APPLICATIONS FOR STAYS

[January 13, 2022]

PER CURIAM.

The Secretary of Health and Human Services adminis-
ters the Medicare and Medicaid programs, which provide
health insurance for millions of elderly, disabled, and low-
income Americans.  In November 2021, the Secretary an-
nounced that, in order to receive Medicare and Medicaid
funding, participating facilities must ensure that their
staff—unless exempt for medical or religious reasons—are
vaccinated against COVID–19.  86 Fed. Reg. 61555 (2021).
Two District Courts enjoined enforcement of the rule, and
the Government now asks us to stay those injunctions.
Agreeing that it is entitled to such relief, we grant the ap-
plications.

Per Curiam

# I

## A

The Medicare program provides health insurance to individuals 65 and older, as well as those with specified disabilities. The Medicaid program does the same for those with low incomes. Both Medicare and Medicaid are administered by the Secretary of Health and Human Services, who has general statutory authority to promulgate regulations "as may be necessary to the efficient administration of the functions with which [he] is charged." 42 U. S. C. §1302(a).

One such function—perhaps the most basic, given the Department's core mission—is to ensure that the healthcare providers who care for Medicare and Medicaid patients protect their patients' health and safety. Such providers include hospitals, nursing homes, ambulatory surgical centers, hospices, rehabilitation facilities, and more. To that end, Congress authorized the Secretary to promulgate, as a condition of a facility's participation in the programs, such "requirements as [he] finds necessary in the interest of the health and safety of individuals who are furnished services in the institution." 42 U. S. C. §1395x(e)(9) (hospitals); see, *e.g.*, §§1395x(cc)(2)(J) (outpatient rehabilitation facilities), 1395i–3(d)(4)(B) (skilled nursing facilities), 1395k(a)(2)(F)(i) (ambulatory surgical centers); see also §§1396r(d)(4)(B), 1396d(*l*)(1), 1396d(*o*) (corresponding provisions in Medicaid Act).

Relying on these authorities, the Secretary has established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds. See, *e.g.*, 42 CFR pt. 482 (2020) (hospitals); 42 CFR pt. 483 (long-term care facilities); 42 CFR §§416.25–416.54 (ambulatory surgical centers). Such conditions have long included a requirement that certain providers maintain and enforce an "infection prevention and control program designed . . . to help prevent the development and transmission of communicable diseases and infections."   §483.80

Per Curiam

(long-term care facilities); see, *e.g.*, §§482.42(a) (hospitals), 416.51(b) (ambulatory surgical centers), 485.725 (facilities that provide outpatient physical therapy and speech-language pathology services).

B

On November 5, 2021, the Secretary issued an interim final rule amending the existing conditions of participation in Medicare and Medicaid to add a new requirement—that facilities ensure that their covered staff are vaccinated against COVID–19. 86 Fed. Reg. 61561, 61616–61627. The rule requires providers to offer medical and religious exemptions, and does not cover staff who telework full-time. *Id.*, at 61571–61572. A facility's failure to comply may lead to monetary penalties, denial of payment for new admissions, and ultimately termination of participation in the programs. *Id.*, at 61574.

The Secretary issued the rule after finding that vaccination of healthcare workers against COVID–19 was "necessary for the health and safety of individuals to whom care and services are furnished." *Id.*, at 61561. In many facilities, 35% or more of staff remain unvaccinated, *id.*, at 61559, and those staff, the Secretary explained, pose a serious threat to the health and safety of patients. That determination was based on data showing that the COVID–19 virus can spread rapidly among healthcare workers and from them to patients, and that such spread is more likely when healthcare workers are unvaccinated. *Id.*, at 61558–61561, 61567–61568, 61585–61586. He also explained that, because Medicare and Medicaid patients are often elderly, disabled, or otherwise in poor health, transmission of COVID–19 to such patients is particularly dangerous. *Id.*, at 61566, 61609. In addition to the threat posed by in-facility transmission itself, the Secretary also found that "fear of exposure" to the virus "from unvaccinated health care staff can lead patients to themselves forgo seeking

Per Curiam

medically necessary care," creating a further "ris[k] to pa-tient health and safety." *Id.*, at 61588. He further noted that staffing shortages caused by COVID–19-related expo-sures or illness has disrupted patient care. *Id.*, at 61559.

The Secretary issued the rule as an interim final rule, rather than through the typical notice-and-comment proce-dures, after finding "good cause" that it should be made ef-fective immediately. *Id.*, at 61583–61586; see 5 U. S. C. §553(b)(B). That good cause was, in short, the Secretary's belief that any "further delay" would endanger patient health and safety given the spread of the Delta variant and the upcoming winter season. 86 Fed. Reg. 61583–61586.

C

Shortly after the interim rule's announcement, two groups of States—one led by Louisiana and one by Mis-souri—filed separate actions challenging the rule. The U. S. District Courts for the Western District of Louisiana and the Eastern District of Missouri each found the rule de-fective and entered preliminary injunctions against its en-forcement. *Louisiana* v. *Becerra*, 2021 WL 5609846 (Nov. 30, 2021); *Missouri* v. *Biden*, 2021 WL 5564501 (Nov. 29, 2021). In each case, the Government moved for a stay of the injunction from the relevant Court of Appeals. In *Lou-isiana*, the Fifth Circuit denied the Government's motion. 20 F. 4th 260 (2021). In *Missouri*, the Eighth Circuit did so as well. See Order in No. 21–3725 (Dec. 13, 2021). The Government filed applications asking us to stay both Dis-trict Courts' preliminary injunctions, and we heard expe-dited argument on its requests.

II

A

First, we agree with the Government that the Secretary's rule falls within the authorities that Congress has con-ferred upon him.

Per Curiam

Congress has authorized the Secretary to impose conditions on the receipt of Medicaid and Medicare funds that "the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services."  42 U. S. C. §1395x(e)(9).\*  COVID–19 is a highly contagious, dangerous, and—especially for Medicare and Medicaid patients—deadly disease.  The Secretary of Health and Human Services determined that a COVID–19 vaccine mandate will substantially reduce the likelihood that healthcare workers will contract the virus and transmit it to their patients.  86 Fed. Reg. 61557–61558.  He accordingly concluded that a vaccine mandate is "necessary to promote and protect patient health and safety" in the face of the ongoing pandemic.  *Id.*, at 61613.

The rule thus fits neatly within the language of the statute.  After all, ensuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm.  It would be the "very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID–19."  *Florida* v. *Department of Health and Human Servs.*, 19 F. 4th 1271, 1288 (CA11 2021).

The States and JUSTICE THOMAS offer a narrower view of

---

\*While this provision pertains only to hospitals, the Secretary has similar statutory powers with respect to most other categories of healthcare facilities covered by the interim rule.  See *supra*, at 2.  JUSTICE THOMAS points out that for five such kinds of facilities, the relevant statute does not contain express "health and safety" language.  *Post*, at 3 (dissenting opinion).  But employees at these facilities—which include end-stage renal disease clinics and home infusion therapy suppliers—represent less than 3% of the workers covered by the rule.  See Tr. of Oral Arg. 25.  And even with respect to them, the pertinent statutory language may be read as incorporating the "health and safety" authorities applicable to the other 97%.  See, *e.g.*, 42 U. S. C. §1396d(d)(1).  We see no reason to let the infusion-clinic tail wag the hospital dog, especially because the rule has an express severability provision.  86 Fed. Reg. 61560.

Per Curiam

the various authorities at issue, contending that the seemingly broad language cited above authorizes the Secretary to impose no more than a list of bureaucratic rules regarding the technical administration of Medicare and Medicaid. But the longstanding practice of Health and Human Services in implementing the relevant statutory authorities tells a different story. As noted above, healthcare facilities that wish to participate in Medicare and Medicaid have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare, not simply sound accounting. Such requirements govern in detail, for instance, the amount of time after admission or surgery within which a hospital patient must be examined and by whom, 42 CFR §482.22(c)(5), the procurement, transportation, and transplantation of human kidneys, livers, hearts, lungs, and pancreases, §482.45, the tasks that may be delegated by a physician to a physician assistant or nurse practitioner, §483.30(e), and, most pertinent here, the programs that hospitals must implement to govern the "surveillance, prevention, and control of . . . infectious diseases," §482.42.

Moreover, the Secretary routinely imposes conditions of participation that relate to the qualifications and duties of healthcare workers themselves. See, *e.g.*, §§482.42(c)(2)(iv) (requiring training of "hospital personnel and staff" on "infection prevention and control guidelines"), 483.60(a)(1)(ii) (qualified dieticians must have completed at least 900 hours of supervised practice), 482.26(b)–(c) (specifying personnel authorized to use radiologic equipment). And the Secretary has always justified these sorts of requirements by citing his authorities to protect patient health and safety. See, *e.g.*, §§482.1(a)(1)(ii), 483.1(a)(1)(ii), 416.1(a)(1). As these examples illustrate, the Secretary's role in administering Medicare and Medicaid goes far beyond that of a mere bookkeeper.

Indeed, respondents do not contest the validity of this

Per Curiam

longstanding litany of health-related participation conditions.  When asked at oral argument whether the Secretary could, using the very same statutory authorities at issue here, require hospital employees to wear gloves, sterilize instruments, wash their hands in a certain way and at certain intervals, and the like, Missouri answered yes: "[T]he Secretary certainly has authority to implement all kinds of infection control measures at these facilities."  Tr. of Oral Arg. 57–58.  Of course the vaccine mandate goes further than what the Secretary has done in the past to implement infection control.  But he has never had to address an infection problem of this scale and scope before.  In any event, there can be no doubt that addressing infection problems in Medicare and Medicaid facilities is what he does.

And his response is not a surprising one.  Vaccination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella.  CDC, State Healthcare Worker and Patient Vaccination Laws (Feb. 28, 2018), https://www.cdc.gov/ phlp/publications/topic/vaccinationlaws.html.  As the Secretary explained, these pre-existing state requirements are a major reason the agency has not previously adopted vaccine mandates as a condition of participation.  86 Fed. Reg. 61567–61568.

All this is perhaps why healthcare workers and public-health organizations overwhelmingly support the Secretary's rule.  See *id.*, at 61565–61566; see also Brief for American Medical Assn. et al. as *Amici Curiae*; Brief for American Public Health Assn. et al. as *Amici Curiae*; Brief for Secretaries of Health and Human Services et al. as *Amici Curiae*.  Indeed, their support suggests that a vaccination requirement under these circumstances is a straightforward and predictable example of the "health and

Per Curiam

safety" regulations that Congress has authorized the Secretary to impose.

We accordingly conclude that the Secretary did not exceed his statutory authority in requiring that, in order to remain eligible for Medicare and Medicaid dollars, the facilities covered by the interim rule must ensure that their employees be vaccinated against COVID–19.

B

We also disagree with respondents' remaining contentions in support of the injunctions entered below.  First, the interim rule is not arbitrary and capricious.  Given the rulemaking record, it cannot be maintained that the Secretary failed to "examine the relevant data and articulate a satisfactory explanation for" his decisions to (1) impose the vaccine mandate instead of a testing mandate; (2) require vaccination of employees with "natural immunity" from prior COVID–19 illness; and (3) depart from the agency's prior approach of merely encouraging vaccination. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983); see 86 Fed. Reg. 61583, 61559–61561, 61614.  Nor is it the case that the Secretary "entirely failed to consider" that the rule might cause staffing shortages, including in rural areas.  *State Farm*, 463 U. S., at 43; see 86 Fed. Reg. 61566, 61569, 61607–61609.  As to the additional flaws the District Courts found in the Secretary's analysis, particularly concerning the nature of the data relied upon, the role of courts in reviewing arbitrary and capricious challenges is to "simply ensur[e] that the agency has acted within a zone of reasonableness." *FCC* v. *Prometheus Radio Project*, 592 U. S. ___, ___ (2021) (slip op., at 12).

Other statutory objections to the rule fare no better.  First, JUSTICE ALITO takes issue with the Secretary's finding of good cause to delay notice and comment.  But the Secretary's finding that accelerated promulgation of the rule in

Per Curiam

advance of the winter flu season would significantly reduce COVID–19 infections, hospitalizations, and deaths, 86 Fed. Reg. 61584–61586, constitutes the "something specific," *post*, at 3 (dissenting opinion), required to forgo notice and comment. And we cannot say that in this instance the two months the agency took to prepare a 73-page rule constitutes "delay" inconsistent with the Secretary's finding of good cause. Second, we agree with the Secretary that he was not required to "consult with appropriate State agencies," 42 U. S. C. §1395z, in advance of issuing the interim rule. Consistent with the existence of the good cause exception, which was properly invoked here, consultation during the deferred notice-and-comment period is permissible. We similarly concur with the Secretary that he need not prepare a regulatory impact analysis discussing a rule's effect on small rural hospitals when he acts through an interim final rule; that requirement applies only where the Secretary proceeds on the basis of a "notice of proposed rulemaking," §1302(b)(1), followed by a "final version of [the] rule," §1302(b)(2). Lastly, the rule does not run afoul of the directive in §1395 that federal officials may not "exercise any supervision or control over the . . . manner in which medical services are provided, or over the selection [or] tenure . . . of any officer or employee of" any facility. That reading of section 1395 would mean that nearly every condition of participation the Secretary has long insisted upon is unlawful.

*    *    *

The challenges posed by a global pandemic do not allow a federal agency to exercise power that Congress has not conferred upon it. At the same time, such unprecedented circumstances provide no grounds for limiting the exercise of authorities the agency has long been recognized to have. Because the latter principle governs in these cases, the applications for a stay presented to JUSTICE ALITO and JUSTICE KAVANAUGH and by them referred to the Court are

Per Curiam

granted.

The District Court for the Eastern District of Missouri's November 29, 2021, order granting a preliminary injunction is stayed pending disposition of the Government's appeal in the United States Court of Appeals for the Eighth Circuit and the disposition of the Government's petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court.

The District Court for the Western District of Louisiana's November 30, 2021, order granting a preliminary injunction is stayed pending disposition of the Government's appeal in the United States Court of Appeals for the Fifth Circuit and the disposition of the Government's petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

Cite as: 595 U. S. ____ (2022)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 21A240 and 21A241

————————

## JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS
21A240                          *v.*
### MISSOURI, ET AL.


## XAVIER BECERRA, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL., APPLICANTS
21A241                          *v.*
### LOUISIANA, ET AL.

ON APPLICATIONS FOR STAYS

[January 13, 2022]

JUSTICE THOMAS, with whom JUSTICE ALITO, JUSTICE GORSUCH, and JUSTICE BARRETT join, dissenting.

Two months ago, the Department of Health and Human Services (HHS), acting through the Centers for Medicare and Medicaid Services (CMS), issued an omnibus rule mandating that medical facilities nationwide order their employees, volunteers, contractors, and other workers to receive a COVID–19 vaccine.  Covered employers must fire noncompliant workers or risk fines and termination of their Medicare and Medicaid provider agreements.  As a result, the Government has effectively mandated vaccination for 10 million healthcare workers.

Two District Courts preliminarily enjoined enforcement of the omnibus rule, and the Government now requests an emergency stay of those injunctions pending appeal.  Because the Government has not made a strong showing that it has statutory authority to issue the rule, I too would deny a stay.

THOMAS, J., dissenting

To obtain a stay, the Government must show that there is (1) a reasonable probability that we would grant certiorari; (2) a fair prospect that we would reverse the judgments below; and (3) a likelihood that irreparable harm will result from denying a stay. *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*). Because there is no real dispute that this case merits our review, our decision turns primarily on whether the Government can make a "strong showing" that it is likely to succeed on the merits. *Nken* v. *Holder*, 556 U. S. 418, 426 (2009). In my view, the Government has not made such a showing here.

The Government begins by invoking two statutory provisions that generally grant CMS authority to promulgate rules to implement Medicare and Medicaid. The first authorizes CMS to "publish such rules and regulations . . . as may be necessary to the efficient administration of the [agency's] functions." 42 U. S. C. §1302(a). The second authorizes CMS to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs" under the Medicare Act. §1395hh(a)(1).

The Government has not established that either provision empowers it to impose a vaccine mandate. Rules carrying out the "administration" of Medicare and Medicaid are those that serve "the practical management and direction" of those programs. Black's Law Dictionary 58 (3d ed. 1933). Such rules are "necessary" to "administration" if they bear "an actual and discernible nexus" to the programs' practical management. *Merck & Co.*, *Inc.* v. *United States Dept. of Health and Human Servs.*, 962 F. 3d 531, 537–538 (CADC 2020) (internal quotation marks omitted). Here, the omnibus rule compels millions of healthcare workers to undergo an unwanted medical procedure that "cannot be removed at the end of the shift," *In re MCP No. 165*, 20 F. 4th 264, 268 (CA6 2021) (Sutton, C. J., dissenting from denial of initial hearing en banc). To the extent the rule has any connection to the management of Medicare

THOMAS, J., dissenting

and Medicaid, it is at most a "tangential" one. *Merck & Co., Inc.*, 962 F. 3d, at 538.

At oral argument, the Government largely conceded that §1302(a) and §1395hh(a)(1) alone do not authorize the omnibus rule. See Tr. of Oral Arg. 7, 10. Instead, it fell back on a constellation of statutory provisions that each concern one of the 15 types of medical facilities that the rule covers. See 86 Fed. Reg. 61567 (2021). Several of those provisions contain language indicating that CMS may regulate those facilities in the interest of "health and safety." In the Government's view, that language authorizes CMS to adopt any "requirements that [CMS] deems necessary to ensure patient health and safety," including a vaccine mandate applicable to all facility types. Application in No. 21A240, p. 19. The majority, too, treats these scattered provisions as a singular (and unqualified) delegation to the Secretary to adopt health and safety regulations.

The Government has not made a strong showing that this agglomeration of statutes authorizes any such rule. To start, 5 of the 15 facility-specific statutes do not authorize CMS to impose "health and safety" regulations at all. See 42 U. S. C. §§1396d(d)(1), (h)(1)(B)(i), 1395rr(b)(1)(A), 1395x(iii)(3)(D)(i)(IV), 1395i–4(e). These provisions cannot support an argument based on statutory text they lack. Perhaps that is why the Government only weakly defends them as a basis for its authority. See Tr. of Oral Arg. 25–28.

Next, the Government identifies eight definitional provisions describing, for example, what makes a hospital a "hospital." These define covered facilities as those that comply with a variety of conditions, including "such other requirements as the Secretary finds necessary in the interest of . . . health and safety." §1395x(e)(9); see also §§1395x(dd)(2)(G), (o)(6), (ff)(3)(B)(iv), (cc)(2)(J), (p)(4)(A)(v), (aa)(2)(K), 1395k(a)(2)(F)(i). The Government similarly invokes a saving clause for "health and safety"

regulations applicable to "all-inclusive care" programs for the elderly, see §§1395eee(f)(4), 1396u–4(f)(4), and a requirement that long-term nursing facilities "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment . . . to help prevent the development and transmission of disease," §1395i–3(d)(3).

The Government has not made a strong showing that this hodgepodge of provisions authorizes a nationwide vaccine mandate. We presume that Congress does not hide "fundamental details of a regulatory scheme in vague or ancillary provisions." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001). Yet here, the Government proposes to find virtually unlimited vaccination power, over millions of healthcare workers, in definitional provisions, a saving clause, and a provision regarding long-term care facilities' sanitation procedures. The Government has not explained why Congress would have used these ancillary provisions to house what can only be characterized as a "fundamental detail" of the statutory scheme. Had Congress wanted to grant CMS power to impose a vaccine mandate across all facility types, it would have done what it has done elsewhere—specifically authorize one. See 22 U. S. C. §2504(e) (authorizing mandate for "such immunization . . . as necessary and appropriate" for Peace Corps volunteers).

Nonetheless, even if I were to accept that Congress could have hidden vaccine-mandate power in statutory definitions, the language in these "health and safety" provisions does not suggest that Congress did so. Take, for example, 42 U. S. C. §1395x(e), which defines "hospital" for certain purposes. Three subsections define hospitals as providers of specific patient services, see §§1395x(e)(1), (4), (5), and five describe administrative requirements that a facility must meet to qualify as a covered hospital, see §§1395x(e)(2)–(3), (6)–(8). The final subsection then pro-

THOMAS, J., dissenting

vides that a "hospital" must also "mee[t] *such other* requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services." §1395x(e)(9) (emphasis added).

Contrary to the Government's position, this kind of catchall provision does not authorize every regulation related to "health and safety." As with all statutory language, context must inform the scope of the provision. See *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 408 (1999) (THOMAS, J., concurring in part and dissenting in part) (citing *Neal* v. *Clark*, 95 U. S. 704, 708 (1878)). "[W]here, as here, a more general term follows more specific terms in a list, the general term is usually understood to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Epic Systems Corp.* v. *Lewis*, 584 U. S. ___, ___ (2018) (slip op., at 12) (internal quotation marks omitted). That presumption is particularly forceful where the statutory catchall refers to "such other" requirements, signaling that the subjects that come before delimit any residual authority. See *ibid.* Here, in §1395x(e), none of the myriad subsections preceding the "health and safety" subsection suggests that the Government can order hospitals to require virtually all hospital personnel to be vaccinated. Rather, these subsections show that HHS' residual authority embraces only administrative requirements like those that precede it—including "provid[ing] 24-hour nursing service," "maintain[ing] clinical records on all patients," or having "bylaws in effect." §§1395x(e)(2), (3), (5). A requirement that all healthcare workers be vaccinated is plainly different in kind. The same reasoning applies to almost all of the Government's proposed facility-specific statutes. See §§1395x(aa)(2), (dd)(2), (*o*)(6); see also §§1395x(ff)(3)(B), (p)(4)(A), (cc)(2), 1395eee, 1396u–4(f)(4).

Only one facility-specific provision is arguably different. It regulates long-term care facilities and mandates an "infection control program" among its "health and safety"

provisions. §1395i–3(d)(3). But that infection-control pro-vision focuses on sanitizing the facilities' "environment," not its personnel. *Ibid.* In any event, even if this statutory language justified a vaccine mandate in long-term care fa-cilities, it could not sustain the omnibus rule. Neither the "infection control" language nor a reasonable analog ap-pears in any of the other facility-specific provisions. Basic interpretive principles would thus suggest that CMS lacks vaccine-mandating authority with respect to the other types of facilities. See *Russello* v. *United States,* 464 U. S. 16, 23 (1983). And, of course, the omnibus rule cannot rest on the long-term care provision alone. By CMS' own estimate, long-term care facilities employ only 10% of the 10 million healthcare workers that the rule covers. 86 Fed. Reg. 61603. Put simply, the oblique reference to "infection control" in the definitional provision for long-term care fa-cilities cannot authorize an omnibus vaccine mandate cov-ering *every* type of facility that falls within CMS' purview.

For its part, the Court does not rely on the Government's proffered statutory provisions. Instead, it asserts that CMS possesses broad vaccine-mandating authority by pointing to a handful of CMS regulations. To begin, the Court does not explain why the bare existence of these regulations is evidence of what Congress empowered the agency to do. Re-lying on them appears to put the cart before the horse.

Regardless, these regulations provide scant support for the sweeping power the Government now claims. For ex-ample, CMS regulations that mandate the number of hours a dietician must practice under supervision, *ante,* at 6 (cit-ing 42 CFR §483.60 (2020)), or that prescribe "the tasks that may be delegated . . . to a physician assistant or nurse practitioner," *ante,* at 6 (citing §483.30(e)), cannot support a vaccine mandate for healthcare personnel.

The Court also invokes a regulation requiring hospitals to implement programs that "govern the 'surveillance, pre-vention, and control of . . . infectious diseases,'" *ante,* at 6

THOMAS, J., dissenting

(quoting §482.42), as well as a few regulations that require "infection and prevention control programs" at some (but apparently not all) facility types. See *ante*, at 3 (citing, *inter alia*, §482.42). But many of these infection-control regulations, like the infection-control program set out at 42 U. S. C. §1395i–3(d)(3), are far afield from immunization. See, *e.g.*, 42 CFR §§485.725(b)–(e) (specifying requirements for "aseptic techniques," "housekeeping services," "[l]inens," and "[p]est control"). And insofar as they do touch on immunization, they require only that facilities *offer* their *residents* the opportunity to obtain a vaccine, along with "the opportunity to refuse" it. §483.80(d)(1). These regulations are not precedents for CMS' newfound authority *mandating* that all *employees* be vaccinated.

Finally, our precedents confirm that the Government has failed to make a strong showing on the merits. "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ___, ___ (2021) (*per curiam*) (slip op., at 6) (internal quotation marks omitted). And we expect Congress to use "exceedingly clear language if it wishes to significantly alter the balance between state and federal power." *Ibid.* (internal quotation marks omitted). The omnibus rule is undoubtedly significant—it requires millions of healthcare workers to choose between losing their livelihoods and acquiescing to a vaccine they have rejected for months. Vaccine mandates also fall squarely within a State's police power, see *Zucht* v. *King*, 260 U. S. 174, 176 (1922), and, until now, only rarely have been a tool of the Federal Government. If Congress had wanted to grant CMS authority to impose a nationwide vaccine mandate, and consequently alter the state-federal balance, it would have said so clearly. It did not.

8                         BIDEN *v.* MISSOURI

                         THOMAS, J., dissenting

                          *     *     *

   These cases are not about the efficacy or importance of
COVID–19 vaccines.  They are only about whether CMS
has the statutory authority to force healthcare workers, by
coercing their employers, to undergo a medical procedure
they do not want and cannot undo.  Because the Govern-
ment has not made a strong showing that Congress gave
CMS that broad authority, I would deny the stays pending
appeal.  I respectfully dissent.

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 21A240 and 21A241

_____

JOSEPH R. BIDEN, JR., PRESIDENT OF THE
UNITED STATES, ET AL., APPLICANTS

21A240                 *v.*
MISSOURI, ET AL.


XAVIER BECERRA, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL., APPLICANTS

21A241                 *v.*
LOUISIANA, ET AL.

ON APPLICATIONS FOR STAYS

[January 13, 2022]

JUSTICE ALITO, with whom JUSTICE THOMAS, JUSTICE
GORSUCH, and JUSTICE BARRETT join, dissenting.

I join JUSTICE THOMAS's dissent because I do not think
that the Federal Government is likely to be able to show
that Congress has authorized the unprecedented step of
compelling over 10,000,000 healthcare workers to be vac-
cinated on pain of being fired. The support for the argu-
ment that the Federal Government possesses such author-
ity is so obscure that the main argument now pressed by
the Government—that the authority is conferred by a
hodgepodge of scattered provisions—was not prominently
set out by the Government until its reply brief in this Court.
Before concluding that the Federal Government possesses
this authority, we should demand stronger statutory proof
than has been mustered to date.

But even if the Federal Government has the authority to
require the vaccination of healthcare workers, it did not
have the authority to impose that requirement in the way

ALITO, J., dissenting

it did.  Under our Constitution, the authority to make laws that impose obligations on the American people is conferred on Congress, whose Members are elected by the people. Elected representatives solicit the views of their constituents, listen to their complaints and requests, and make a great effort to accommodate their concerns.  Today, however, most federal law is not made by Congress.  It comes in the form of rules issued by unelected administrators.  In order to give individuals and entities who may be seriously impacted by agency rules at least some opportunity to make their views heard and to have them given serious consideration, Congress has clearly required that agencies comply with basic procedural safeguards.  Except in rare cases, an agency must provide public notice of proposed rules, 5 U. S. C. §553(b); the public must be given the opportunity to comment on those proposals, §553(c); and if the agency issues the rule, it must address concerns raised during the notice-and-comment process.  *United States* v. *Nova Scotia Food Products Corp.*, 568 F. 2d 240, 252 (CA2 1977); see also *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983).  The rule may then be challenged in court, and the court may declare the rule unlawful if these procedures have not been followed.

In these cases, the relevant agency did none of those things, and the Court rewards this extraordinary departure from ordinary principles of administrative procedure.  Although today's ruling means only that the Federal Government is likely to be able to show that this departure is lawful, not that it actually is so, this ruling has an importance that extends beyond the confines of these cases.  It may have a lasting effect on Executive Branch behavior.

Because of the importance of notice-and-comment rulemaking, an agency must show "good cause" if it wishes to skip that process.  5 U. S. C. §553(b)(3)(B).  Although this Court has never precisely defined what an agency must do

ALITO, J., dissenting

to demonstrate good cause, federal courts have consistently held that exceptions to notice-and-comment must be "'narrowly construed and only reluctantly countenanced.'" *Mack Trucks, Inc.* v. *EPA*, 682 F. 3d 87, 93 (CADC 2012) (quoting *Utility Solid Waste Activities Group* v. *EPA*, 236 F. 3d 749, 754 (CADC 2001)); see also C. Koch & R. Murphy, Good Cause for Avoiding Procedures, 1 Admin. L. & Prac. §4:13 (3d ed. 2021).

The agency that issued the mandate at issue here, *i.e.,* the Centers for Medicare and Medicaid Services (CMS), admits it did not comply with the commonsense measure of seeking public input before placing binding rules on millions of people, but it claims that "[t]he data showing the vital importance of vaccination" indicate that it "cannot delay taking this action." 86 Fed. Reg. 61555, 61583 (2021). But CMS's generalized justification cannot alone establish good cause to dispense with Congress's clear procedural safeguards. An agency seeking to show good cause must "point to something specific that illustrates a particular harm that will be caused by the delay required for notice and comment." *United States* v. *Brewer*, 766 F. 3d 884, 890 (CA8 2014) (internal quotation marks omitted).

Although CMS argues that an emergency justifies swift action, both District Courts below held that CMS fatally undercut that justification with its own repeated delays. The vaccines that CMS now claims are vital had been widely available 10 months before CMS's mandate, and millions of healthcare workers had already been vaccinated before the agency took action. President Biden announced the CMS mandate on September 9, 2021, nearly two months before the agency released the rule on November 5, and the mandate itself delayed the compliance deadline further by another month until December 6. 86 Fed. Reg. 61555; *id.,* at 61573 (making implementation of the vaccine mandate begin "30 days after publication" and completed "60 days after publication"). This is hardly swift.

ALITO, J., dissenting

CMS argues that its delay, "even if true," does not provide a "reason to block a rule" that it claims will protect patient health. Application in No. 21A241, p. 36. It claims that its departure from ordinary procedure after extraordinary delay should be excused because nobody can show they were prejudiced by the lack of a comment period before the rule took effect. But it is CMS's affirmative burden to show it has good cause, not respondents' burden to prove the negative. *Northern Arapahoe Tribe* v. *Hodel*, 808 F. 2d 741, 751 (CA10 1987). Congress placed procedural safeguards on executive rulemaking so agencies would consider "important aspect[s] of the problem[s]" they seek to address before restricting the liberty of the people they regulate. *State Farm*, 463 U. S., at 43. Because CMS chose to circumvent notice-and-comment, States that run Medicaid facilities, as well as other regulated parties, had no opportunity to present evidence refuting or contradicting CMS's justifications before the rule bound them. And because CMS acknowledged its own "uncertainty" and the "rapidly changing nature of the current pandemic," 86 Fed. Reg. 61589, it should have been *more* receptive to feedback, not less. "[A]n utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Cooperative of Florida* v. *Veneman*, 289 F. 3d 89, 96 (CADC 2002).

Today's decision will ripple through administrative agencies' future decisionmaking. The Executive Branch already touches nearly every aspect of Americans' lives. In concluding that CMS had good cause to avoid notice-and-comment rulemaking, the Court shifts the presumption against compliance with procedural strictures from the unelected agency to the people they regulate. Neither CMS nor the Court articulates a limiting principle for why, after an unexplained and unjustified delay, an agency can regulate first and listen later, and then put more than 10 million

Cite as:  595 U. S. ____ (2022)                    5

ALITO, J., dissenting

healthcare workers to the choice of their jobs or an irreversible medical treatment.

Therefore, I respectfully dissent.